UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                       :
MARLON M. RIVERA,                               :         **MEMORANDUM**
                                                       :         **DECISION AND ORDER**
                                   Plaintiff,       :
                                                       :         11 Civ. 4132 (BMC)
                         - against -                      :
                                                       :
MICHAEL J. ASTRUE,                           :
COMMISSIONER OF SOCIAL SECURITY,   :
                                                       :
                                   Defendant.      :
-------------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking an order to vacate the final administrative decision of an Administrative Law Judge ("ALJ") and remand this action solely for calculation of disability benefits. Plaintiff and the Commissioner of Social Security have each filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, the Commissioner's motion is granted and plaintiff's motion is denied.

## BACKGROUND

### I. Procedural Background

Plaintiff applied for Supplemental Security Income ("SSI") benefits on June 3, 2010, alleging disability since October 1, 2008, due to fractured ankles. When his application was denied, plaintiff requested a hearing before an ALJ, which was held on February 16, 2011. In a decision dated March 25, 2011, ALJ Miriam L. Shire found that plaintiff was not disabled. This

---

[1] The Commissioner did not file a separate Rule 12(c) motion. However, he did file a memorandum of law in support of a cross-motion. The Court assumes that this was an oversight and will deem the memorandum of law to be a cross-motion since plaintiff responded to it.

decision became the final decision of the Commissioner on July 8, 2011, when the Appeals Council denied plaintiff's request for review. Mr. Rivera then commenced this civil action.

## II.     Medical Evidence

Mr. Rivera was admitted to Hospital Buen Samaritano in Aguadilla, Puerto Rico, on September 11, 2008, after sustaining several injuries caused by falling twenty to twenty-five feet while doing construction on his roof. The attending physician applied elastic bandages and soft bandages to both ankles. Plaintiff was then referred to the orthopedic outpatient department for further treatment and was discharged.

X-rays of plaintiff's right foot taken on September 11, 2008, revealed a possible fracture at the base of the plaintiff's right foot as well as possible calcification or foreign bodies around plaintiff's toes. Imaging of plaintiff's left foot revealed osteopenia (low bone mineral density) and osteoarthritis. No fracture of the left foot was identified. Plaintiff also underwent X-ray imaging of his ankles, which displayed fractures of the heel bone in both ankles with displacement of the fractured fragments. On September 18, 2008, plaintiff was seen at Hospital Buen Samaritano for evaluation of possible head trauma. Plaintiff was discharged after X-rays of his skull showed no abnormalities.

Plaintiff checked into Damon House New York, Inc., on January 21, 2010, for a nine to twelve month community services program that assisted with substance and alcohol dependency. The program included individual and group counseling as well as workshops and seminars on various life skill topics. Following his arrival at Damon House, plaintiff began treatment at the Neighborhood and Family Community Health Center, where he complained of aching pain in both feet that worsened with walking and improved with rest. An examination revealed bony prominence of the right foot soft tissue and left foot deformity.

On March 12, 2010, plaintiff went to the Neighborhood and Family Health Center and complained of continued foot pain. He was diagnosed with lower extremity edema (swelling in the foot due to fluid buildup) and was referred to a podiatrist, Dr. Roosevelt Hazzard. Dr. Hazzard prescribed orthotics (custom made insoles for plaintiff to wear daily).

On June 28, 2010, Dr. Eugene Edynak conducted a consultative examination of plaintiff in connection with his SSI claim. Plaintiff reported that he had bilateral "stabbing" pain since his ankle fractures. Plaintiff described the pain as a level five out of ten and explained that the pain was relieved, with some medication, down to a level of three out of ten. Plaintiff described his daily activities to Dr. Edynak, which consisted of cleaning, shopping and laundering his clothes once per week, and showering and dressing himself daily.

Dr. Edynak observed that plaintiff appeared in no acute distress, presented with a normal station, walked without a noticeable limp, but could not walk on his toes or heels. Dr. Edynak further noted that plaintiff used no assistive devices and required no assistance changing for the examination or getting on and off the examination table. Examination revealed a full range of motion in plaintiff's spine and no spinal or paraspinal tenderness. Dr. Edynak also noted an absence of vertebral or lower back spasms. Plaintiff had no joint effusion, inflammation, or instability. He showed a restricted range of motion in the ankles. Plantar flexion (movement of toes toward the sole) in the right ankle was zero to forty degrees and in the left ankles was zero to thirty degrees. Dr. Edynak also noted tenderness in both ankles. The doctor indicated that an X-ray of plaintiff's ankles showed normal healing after the fracture he had sustained. Dr. Edynak opined that plaintiff had a mild to moderate limitation with walking, standing, climbing stairs, squatting, heavy lifting, or carrying because of his bilateral ankle pain and restricted range of motion.

On July 11, 2010, plaintiff visited the Neighborhood and Family Health Center complaining of foot pain. However, he had not obtained the orthotics he had been prescribed months earlier. Plaintiff was told that he needed to obtain a diagnosis for his foot pain before the doctors at the center could prescribe treatment or therapy. He was advised to check with a podiatrist regarding orthotics.

On August 3, 2010, an X-ray of plaintiff's heel showed a right heel spur, a bony protrusion on the side of the right heel, and soft tissue calcifications along the middle of the right heel. An X-ray of both feet showed osteoarthritis of the joints of both feet. X-rays of both ankles were normal except for plaintiff's right heel spur. On August 26, 2010, plaintiff presented at the center with a limping gait and stated that he needed an updated prescription for orthotic custom insoles. Dr. Hazzard told plaintiff to decrease all physical movement as much as possible. An X-ray of plaintiff's lower spine on the following day revealed normal findings. Approximately one week later, on September 3, 2010, plaintiff was prescribed physical therapy for low back syndrome, painful right hip, and inflammation on the bottom of both feet.

On September 9, 2010, plaintiff reported that he saw an orthopedist at the Neighborhood and Family Health Center who referred him to physical therapy, but he had no improvement in his pain. Dr. Surekha Bharne, a physiatrist specializing in physical medicine and rehabilitation, completed a spinal impairment questionnaire provided by plaintiff's attorney on February 3, 2011. Dr. Bharne indicated that she saw plaintiff on September 22, 2010; November 11, 2010; and February 3, 2011. Dr. Bharne diagnosed chronic low back pain, a herniated disc, and bilateral ankle pain. Dr. Bharne stated that plaintiff had limited flexion and bilateral tenderness in his lower back. There was no muscle spasm, sensory loss, reflex changes, muscle atrophy, or muscle weakness in plaintiff's lower back. Additionally, plaintiff did not have any limited range

4

of motion, tenderness, muscle spasm, sensory loss, reflex changes, muscle atrophy, or muscle weakness in his neck.  Dr. Bharne stated that plaintiff had no swelling or trigger points but he needed a cane for ankle pain.  The doctor indicated that she had no laboratory or diagnostic tests available to support her diagnosis because plaintiff was treated by another provider.

Dr. Bharne opined that plaintiff could sit up to one hour and stand or walk up to one hour in an eight-hour day.  The doctor further stated that plaintiff's symptoms would constantly interfere with his ability to maintain attention and concentration.  She indicated that plaintiff could not sit continuously and would need to move around every twenty minutes and could not sit again for five to ten minutes.  Plaintiff also could not stand or walk continuously in a work setting.  Dr. Bharne believed that he could frequently lift or carry up to five pounds and occasionally lift up to ten pounds.  She did not prescribe any medications but noted that plaintiff began physical therapy for his ankles in October, 2010.  She opined that due to anxiety plaintiff was incapable of even low-stress work and needed to avoid pushing, pulling, kneeling, bending, stooping, heights, and temperature extremes.

On November 30, 2010, plaintiff was examined by Dr. Ian Prescott and given a biopsychosocial evaluation.  Plaintiff reported pain in his back and ankles.  Dr. Prescott noted bilateral tenderness in the ankles and tenderness in the muscles surrounding the spine.  Plaintiff walked with a cane and showed decreased muscle tone in the upper and lower extremities.  Plaintiff traveled to his appointment via the subway but reported difficulty due to feet and back problems.  Plaintiff denied feeling depressed or having trouble concentrating on things such as a newspaper or watching television.  Plaintiff said he washed dishes, laundered his clothes (with the help of his roommate), swept, mopped, vacuumed the floor, made beds, shopped for groceries, cooked meals, read, socialized, got dressed, and bathed.  His hobbies consisted of

socializing, watching television, and listening to music. He also indicated that he was able to take thirty-five minute subway rides without much difficulty, that he rides a bicycle, and that he uses a Stairmaster three times a week.

Dr. Jacqueline McGibbon examined plaintiff on December 8, 2010. Dr. McGibbon noted chronic back and ankle pain. Dr. McGibbon also noted that orthopedic consultation was done and that plaintiff had lower back pain as well as possible post-traumatic arthritis of the ankles. The doctor stated that plaintiff was capable of light and sedentary work.

On February 11, 2011, Dr. Theodore Giannaris completed a spinal impairment questionnaire provided by plaintiff's attorney. He indicated that he began treating plaintiff on August 27, 2010, and most recently examined him on February 4, 2011. The doctor said he saw plaintiff every two to three weeks. He diagnosed low back syndrome with inflammation of the spinal nerves, painful right hip, and heel spurs of both feet. Plaintiff's lower back had limited flexion, as well as increased tenderness, muscle tightness and weakness, and sensitivity. Dr. Giannaris stated that plaintiff had an abnormal gait and experienced pain during a straight leg test. The doctor indicated that an MRI of plaintiff's lower back showed multiple disc bulges, moderate spinal stenosis (narrowing of spinal canal), and narrowing of several vertebral canals.

Dr. Giannaris opined that plaintiff could sit for up to two hours and stand or walk for up to one hour in an eight-hour day, and that he could not sit or stand continuously in a work setting. The doctor believed that plaintiff's symptoms would constantly interfere with his attention and concentration and that plaintiff was incapable of even low-stress work. Dr. Giannaris suggested that plaintiff should avoid humidity, heights, pushing, pulling, kneeling, bending, and stooping.

6

On March 29, 2011, Dr. Giannaris completed a physician's wellness report. He diagnosed chronic low back pain with spinal inflammation since February, 2011, and osteoarthritis of both feet with heel spurs. The doctor indicated that plaintiff attended scheduled appointments, took prescribed medication, and complied with treatment. Dr. Giannaris noted that plaintiff was sent to physical therapy, was prescribed 800 mg of Ibuprofen, and had been seen by a podiatrist. Plaintiff was instructed to undergo an electromyogram and nerve conduction series. The doctor indicated that plaintiff was still symptomatic.

On April 12, 2011, Dr. Bharne wrote to Dr. Giannaris that plaintiff experienced no improvement of his "intractable back pain" from physical therapy. The doctor added that plaintiff might benefit from pain management.

### III.    Plaintiff's Administrative Hearing

ALJ Shire held an administrative hearing on February 16, 2011, which plaintiff attended with his attorney. Plaintiff testified that he was forty years old at the time of the 2011 hearing and that he had attended school through the tenth grade. He claimed he could not read or write "much" in English and that he had previously worked in construction. He testified that he could travel via mass transportation, including taking a thirty-five minute subway ride.

Plaintiff explained that, on the day of his accident in October of 2008, he fell twenty to twenty-five feet while performing construction work on the roof of his house in Puerto Rico. Plaintiff testified that he had casts on both ankles and used a wheelchair for almost a year. He indicated that no doctor prescribed the wheelchair, but rather that a friend gave it to him. Plaintiff did not return to the hospital to obtain crutches or treatment and said that he was supposed to attend physical therapy but did not because he was having drug problems at the time.

Plaintiff came to New York in 2010, where he attended drug abuse treatment for eleven months in a living facility. He completed his inpatient treatment about one year prior to the February 2011 hearing. In the drug treatment facility, plaintiff acted as an "overseer," an individual responsible for supervising other patients. After completing treatment, plaintiff moved into a three-quarter house that required mandatory outpatient addiction treatment. He had been sober for fourteen months at the time of the February 2011 hearing.

Plaintiff testified that he was attending physical therapy at the time of the hearing. His medication consisted of Ibuprofen, which helped a "little bit" with the pain. He could walk but needed to stop every block. He said he could sit for about one half hour before needing to get up and stretch due to lower back pain. He claimed that he could stand for five or ten minutes and that he could lift about five pounds on average. He also stated that he used a cane to help with his ankle pain and that his roommate cooked and did his laundry for him.

Vocational expert Christina Boardman testified as well. ALJ Shire asked the vocational expert if someone of plaintiff's age, education, background, and English abilities, could perform sedentary level work with a sit/stand option that requires no use of stairs or foot controls and no frequent bending, stooping, or crouching forward. The vocational expert responded that such an individual could work as an assembler, an order clerk, or an addresser of packages. She also testified that if plaintiff were as limited as the ALJ instructed, but also could not lift or carry more than five pounds, plaintiff could not perform any of the jobs she had listed.

**IV.   The ALJ's Decision**

On March 25, 2011, the ALJ denied plaintiff's application after finding he was not disabled from October 1, 2008, until the date of the decision. The ALJ took into consideration all of the medical opinions in the record and ultimately declined to afford controlling weight to

8

the opinions of Dr. Giannaris and Dr. Bharne regarding the amount of weight plaintiff could lift and the length of time plaintiff could sit without discomfort. The ALJ reasoned that these doctors' "assessments, which clearly are inconsistent with the claimant's reported activities of daily living, were based almost entirely on uncritical acceptance of the claimant's subjective complaints of debilitating pain which curiously neither doctor prescribed painkillers for." Additionally, the ALJ gave diminished weight to plaintiff's testimony because she found that plaintiff's complaints of pain lacked credibility. The ALJ ultimately afforded plaintiff the "reasonable benefit of the doubt" concerning his assessment of his pain and found plaintiff capable of strictly sedentary work that would allow him to alternate periods of sitting and standing at will, did not require the operation of foot controls, and did not require climbing stairs, bending, stooping, crawling, or kneeling on more than an occasional basis.

Because plaintiff's previous job as a construction worker entailed heavy lifting and carrying in excess of ten pounds, as well as prolonged standing or walking, the ALJ determined plaintiff could not return to past relevant work. The ALJ indicated that a finding that plaintiff could do all sedentary work would require a finding of "not disabled" without consulting a vocational expert, but due to the additional limitations plaintiff experiences, the ALJ consulted vocational expert Christina Boardman, who indicated that plaintiff could work as a circuit board assembler, an order clerk, or an addresser of packages. The vocational expert's testimony was consistent with the Dictionary of Occupational Titles, and thus plaintiff was found capable of performing these jobs.

## DISCUSSION

### I. Standard of Review

Disability benefits are available to anyone who is deemed disabled as the term is defined in 42 U.S.C. §§ 423(d) and 1382(c). A person is disabled when he displays an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Judicial review of the Commissioner's final decision requires "two levels of inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether correct legal principles were applied. See id.; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standard is grounds for reversal."). Second, the court must decide whether substantial evidence supported the Commissioner's decision. See Johnson, 817 F.2d at 985. The court does not make a *de novo* determination, but undertakes "plenary review" of the record to determine whether there is substantial evidence to support denial of benefits. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (internal quotation marks omitted).

The Commissioner uses a five-step analysis to determine whether a claimant is disabled. See 20 C.F.R. § 416.920. The Commissioner first determines if the claimant is working; if he is engaging in substantial gainful activity, the claim can be denied outright. See 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). The Commissioner next determines whether the claimant has a

"severe impairment" that limits his ability to do work-related activities. See 20 C.F.R. §§ 416.920(a)(4)(ii), 49.920(c), 426.921. If the claimant has a severe impairment, the Commissioner considers whether the disability meets the listings required for automatic dispersal of benefits. See 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d), 416.925, 416.926. Next, if claimant does not meet the listings, the Commissioner determines the claimant's RFC and considers whether claimant is capable of returning to past work. See 20 C.F.R. §§ 516.920(a)(4), 416.920(e), 416.945(a). If the claimant cannot return to past work, the Commissioner determines whether, based on his RFC, the claimant can do other work. See 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

The Social Security Act recognizes a "treating physician rule," which requires the ALJ to afford the opinion of the claimant's treating physician "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence in the record. 20 C.F.R. § 404.1527(d) (2); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). An ALJ who declines to give controlling weight to the treating physicians' medical opinions must give "good reasons" for her decision by considering factors including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)(2)-(6)). The same factors apply when determining how much weight to give a non-treating medical source. See 20 C.F.R. § 404.1527(f).

## II.     The Treating Physician Rule

A treating physician is defined as a medical professional who can "provide a detailed, longitudinal picture" of medical impairments, as opposed to providing an opinion obtained from "the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2). Dr. Giannaris saw plaintiff every two weeks from August 27, 2010, through February 4, 2011, just a few weeks prior to the hearing. Dr. Bharne saw plaintiff four times between September, 2010, and February, 2011. Both of these doctors are thus "treating physicians" within the meaning of 20 C.F.R. §404.1527(c)(2), and plaintiff contends that the ALJ erred by declining to defer to certain conclusions made by these doctors. However, the ALJ had "good reasons" not to afford controlling weight to the opinions of Dr. Giannaris and Dr. Bharne regarding plaintiff's ability to lift or the length of time plaintiff could sit.

Plaintiff contends that the ALJ erred by declining to defer to Dr. Giannaris's opinion that plaintiff was incapable of working. The Commissioner is not bound by treating physician assessments of "total disability," see 20 C.F.R. § 404.1504, yet these assessments still "put the ALJ on notice that there were potentially valid opinions relating to the disability of the plaintiff in the Social Security context" so long as they are supported by objective medical evidence. Blais v. Astrue, No. 08-CV-01223, 2010 U.S. Dist. LEXIS 57234, at *24 (N.D.N.Y. May 13, 2010), report and recommendation adopted sub nom. Blais v. Comm'r of Soc. Sec. Admin., 2010 U.S. Dist. LEXIS 57243 (N.D.N.Y. June 10, 2010). Dr. Giannaris based his opinion on objective medical evidence, such as an MRI and a straight leg raising test. However, other doctors reached different conclusions based on the same evidence. For example, Dr. Ednyak and

Dr. McGibbon each performed straight leg raising tests and found that plaintiff was not limited in this area. Furthermore, the MRI relied on by Dr. Giannaris was also utilized by Dr. Ednyak, who determined that the MRI did not show the disc herniation or nerve root impingement Dr. Giannaris indicated, and that plaintiff retained the capacity to work. In light of these conflicting interpretations of the evidence relied on by Dr. Giannaris, the ALJ was free to reject his determination that plaintiff was unable to work.

The ALJ was also entitled to disregard Dr. Giannaris's opinion that plaintiff could only sit for two hours and that his pain would render him unable to concentrate in a work setting, because this assessment of plaintiff's RFC is contradicted by substantial evidence in the record. A treating physician's opinion that is inconsistent with other substantial evidence in the record is not entitled to controlling weight. See 20 C.F.R. §404.1527(d)(2). In contrast to Dr. Giannaris's finding that plaintiff could only sit for two hours, Dr. Edynak observed that plaintiff was in no acute distress and walked normally without any assistive devices. Examination revealed full flexion, extension, and lateral flexion of the thoracic and lumbar spines bilaterally. Plaintiff had no spinal or paraspinal tenderness, and an absence of thoracic or lumbar spinal spasms. Straight leg raising was negative bilaterally. Plaintiff retained a full range of motion in his hips and knees bilaterally, as well as full strength in his lower extremities. He demonstrated no muscle atrophy or sensory abnormalities. While Dr. Edynak was not a treating physician, the findings of a consultative examiner can constitute substantial evidence in support of an ALJ's determination. See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995). Because his assessments of plaintiff's capabilities contradicted Dr. Giannaris's determination that plaintiff could only sit for two hours, the ALJ was not required to defer to Dr. Giannaris's determination.

Dr. McGibbon's findings also contradict Dr. Giannaris's assessments of plaintiff's capabilities. Although Dr. McGibbon noted that plaintiff had chronic back and ankle pain as well as possible post-traumatic arthritis of the ankles, she concluded that plaintiff was capable of light and sedentary work.

Besides being contradicted by the conclusions of Dr. Ednyak and Dr. McGibbon, Dr. Giannaris's assessment of plaintiff's capabilities was contradicted by plaintiff's own testimony. At the administrative hearing, plaintiff denied feeling depressed or having trouble concentrating on things such as a newspaper or watching television. Plaintiff said he washed dishes, laundered his clothes (with the help of his roommate), swept, mopped, vacuumed the floor, made beds, shopped for groceries, cooked meals, read, socialized, got dressed, and bathed. He also testified that he was able to take thirty-five minute subway rides without much difficulty, that he rides a bicycle, and that he uses a Stairmaster three times a week. As the ALJ noted, these activities are inconsistent with Dr. Giannaris's finding that plaintiff is unable to sit for more than one hour.

Plaintiff also contends that the ALJ erred by declining to defer to Dr. Bharne's opinion that plaintiff is incapable of even low-stress work, and cannot sit or stand for more than one hour, based on plaintiff's anxiety and Dr. Bharne's diagnoses of bilateral ankle pain, chronic low back pain, and lumbar radiculopathy. Dr. Bharne came to these conclusions based on limited flexion in plaintiff's lumbar spine, tenderness of the lower lumbar spine bilaterally, and plaintiff's use of a cane to walk due to ankle pain. She based her anxiety determination on plaintiff's complaint that his inability to work in the job he used to have was causing him anxiety. However, all of these indices are based on plaintiff's subjective reports of pain during the examination rather than on any objective medical findings. For example, tenderness is documented based on plaintiff's reactions to the spinal examination, while plaintiff's flexion is

14

determined by the examiner's observations as plaintiff moves as much as possible without pain. Dr. Bharne specifically acknowledged that she had no objective tests to support her diagnosis because plaintiff was treated by other providers.

Despite the lack of objective medical evidence to support her opinion, Dr. Bharne indicated plaintiff was disabled and was limited to lifting no more than five pounds and sitting for no more than one hour. These determinations are thus either arbitrary or based entirely on plaintiff's subjective complaints. A treating physician's opinion that is based solely on subjective reports of pain, rather than objective medical findings, is not entitled to controlling weight under the regulations unless plaintiff is found to be credible. See Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983). As discussed below, the ALJ found that plaintiff's subjective reports of pain were not credible to the extent alleged. Dr. Bharne's opinion was therefore not entitled to controlling weight, and the ALJ was entitled to reject her conclusions.

### III. The ALJ's Evaluation of Plaintiff's Credibility

Plaintiff contends the ALJ failed to properly evaluate plaintiff's credibility. The ALJ found that, based on the medical evidence, plaintiff's statements concerning the intensity, persistence, and limiting effects of his condition were not entirely credible. The ALJ factored plaintiff's complaints of significant pain into her RFC determination, but ultimately determined that plaintiff's claims were not credible to the extent he alleged.

Plaintiff argues that the ALJ's findings fail to establish that plaintiff's complaints of pain are not credible. For example, plaintiff argues that the ALJ was incorrect in determining that plaintiff's daily activities contradict his testimony regarding his level of pain and ability to do work. The ALJ must take into consideration the claimant's subjective account of his symptoms and limitations, but only "to the extent that they are consistent with objective medical evidence

and other evidence." Alcantara v. Astrue, 667 F. Supp. 2d 262, 276 (S.D.N.Y. 2009) (citing §§ 404.1520(a)(4)(i), (e)-(f); 404.1560(b)(2)). This Court will affirm the ALJ's discounting of a claimant's subjective complaints if "substantial evidence support[ed] [his] determination." Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, *32 (S.D.N.Y. Jan. 7, 2009). Here, the ALJ discounted plaintiff's subjective complaints of pain because they were contradicted in part by his testimony that he washes dishes, does his laundry, sweeps, mops, vacuums, makes his bed, shops for himself, cooks for himself, dresses himself, bathes, and socializes regularly. Plaintiff also indicated he was able to take thirty-five minute subway rides without much difficulty, that he rides a bicycle, and that he uses a Stairmaster three times a week. This extensive testimony, which demonstrates that plaintiff is capable of a wide variety of physical activities, constitutes substantial evidence for the ALJ's determination that plaintiff's complaints of pain were not credible to the extent alleged.

The ALJ also determined that plaintiff's claim of debilitating pain was undercut by his failure to seek treatment earlier and to follow treatment recommendations, such as obtaining prescribed orthotics. Plaintiff contends that the ALJ should have given him the opportunity to explain his failure to follow his treatment recommendations per Social Security Ruling 96-7p, which states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." However, contrary to plaintiff's contentions, the ALJ offered plaintiff the opportunity to explain his failure to follow his treatment recommendations. Plaintiff explained that he did not always comply with treatment plans due to his substance abuse. But, as the ALJ noted, plaintiff was sober in 2010, when these lapses in treatment occurred.

The ALJ also indicated that plaintiff failed to make consistent use of assistive devices. For example, plaintiff maintained that he regularly used a cane, but he was not using one during his consultative examination with Dr. Ednyak, who specifically noted that plaintiff walked normally and used no assistive devices.

Finally, plaintiff argues that the ALJ's rationale for determining that plaintiff lacked credibility was not set forth with sufficient specificity. As plaintiff notes, a "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). But the ALJ carefully explained that her credibility determination was based on a wide range of factors, such as the fact that plaintiff did not immediately seek treatment from a podiatrist or orthopedist despite his claims of great pain, did not follow his treatment plan, failed to make consistent use of assistive devices, and was able to engage in a number of weight-bearing and exertional activities. This detailed explanation is sufficient to "permit intelligible plenary review of the record," and remand therefore is not warranted on these grounds.

### IV.   The ALJ's Reliance on Vocational Expert Testimony

Plaintiff's final argument is that the ALJ relied on flawed vocational expert testimony because the hypothetical supplied to the vocational expert did not reflect the opinions of the treating specialists. Since plaintiff argues that the ALJ should have deferred to the treating physicians' opinions, plaintiff correspondingly argues that the hypothetical supplied to the vocational expert should have been drawn from the treating physicians' assessments of plaintiff's capabilities. This argument thus relies on an assumption that the ALJ failed to follow the treating physician rule. Because this Court has determined that ALJ was entitled to disregard the RFCs provided by plaintiff's treating physicians, this argument fails. The vocational expert's

testimony matches with the hypothetical furnished by the ALJ, and that hypothetical was based on substantial evidence. The ALJ therefore appropriately relied on the vocational expert's testimony to carry the Commissioner's burden of proof.

## **CONCLUSION**

For the foregoing reasons, plaintiff's [7] motion is denied and the Commissioner's [11] cross-motion is granted. The Commissioner's decision is affirmed and this action is dismissed. The Clerk is directed to enter judgment accordingly.

Signed electronically/Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
       August 11, 2012